## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) |
| | )    Chapter 15 |
| ABENGOA, S.A., *et al.*,[1] | ) |
| | )    Case No. 16-10754 (  ) |
| | ) |
| Debtors in a Foreign Proceeding. | )    (Joint Administration Requested) |
| | ) |

## MEMORANDUM OF LAW IN SUPPORT OF
## EMERGENCY MOTION FOR PROVISIONAL RELIEF

---

[1]     The last four digits of the Employer Identification Number or Spanish Tax Number, as appropriate, for each debtor follow in parentheses: Abengoa, S.A. (7844); Abeinsa Asset Management, S.L. (formerly Abener Inversiones, S.L.) (4597); Abeinsa Inversiones Latam, S.L. (formerly Dimange Inversiones 2009, S.L.) (9680); Abeinsa, Ingeniería Y Construcción Industrial, S.A. (1355); Abencor Suministros S.A. (9461); Industriales y Comerciales, S.A. (5977); Abener Energía, S.A. (1759); Abengoa Bioenergía, S.A. (3249); Abeinsa Infraestructuras Medio Ambiente, S.A. (formerly Befesa Agua) (0792); Abengoa Finance, S.A. (0266); Abengoa Concessions, S.L. (8044); Abengoa Solar España, S.A. (formerly Solúcar Energía, S.A.) (5314); Abengoa Solar New Technologies S.A. (formerly Solúcar, Investigación y Desarrollo (Solúcar, R&D), S.A.) (2116); Abentel Telecomunicaciones, S.A. (0178); Asa Desulfuración, S.A. (formerly Befesa Desulfuración, S.A.) (0823); Bioetanol Galicia, S.A. (2146); Ecoagrícola, S.A. (1986); Instalaciones Inabensa, S.A. (2466); Europea de Construcciones Metálicas, S.A. (1303); Siema Technologies, S.L. (formerly Telvent Corporation) (3340); Teyma, Gestión De Contratos De Construcción E Ingeniería, S.A. (5852); Abengoa Water, S.L. (formerly Befesa Water Projects S.L) (6958); Abengoa Solar S.A. (formerly Solúcar Solar) (9982); Abengoa Greenfield S.A.U. (3677); Abengoa Greenbridge, S.A.U. (8452).

Dated:  Wilmington, Delaware
        March 28, 2016

Respectfully submitted,

**DLA PIPER LLP (US)**

By:   /s/ R. Craig Martin
R. Craig Martin, Esq. (Bar No. 5032)
1201 North Market Street, 21st Floor
Wilmington, DE 19801
Telephone: 302.468.5700
Facsimile:  302. 778.7834
E-mail: Craig.Martin@dlapiper.com

- and -

Richard A. Chesley, Esq.
Oksana Koltko Rosaluk, Esq.
203 North LaSalle Street, Suite 1900
Chicago, IL 60601-1293
Telephone: 312.368.4000
Facsimile: 312.236.7516
E-mail: Richard.Chesley@dlapiper.com
       Oksana.KoltkoRosaluk@dlapiper.com

*Attorneys for Foreign Representative of Foreign Debtors, Abengoa, S.A. and its related subsidiary petitioners*

# TABLE OF CONTENTS

**PAGE**

I.    PRELIMINARY STATEMENT ................................................................. 1

II.    FACTUAL BACKGROUND ................................................................... 3

    A.    The Company's Business and Operations ........................................... 3

    B.    The Company's Capital Structure ...................................................... 5

    C.    Events Leading to the Filing of the Spanish Proceeding ...................... 6

    D.    The Foreign Proceeding and the Appointment of the Foreign Representative .......................................................................... 7

    E.    The Chapter 15 Filing ................................................................... 13

III.    THE COURT SHOULD GRANT THE PROVISIONAL RELIEF REQUESTED UNDER SECTION 1519 OF THE BANKRUPTCY CODE ......................... 13

IV.    THE PROVISIONAL RELIEF IS AUTHORIZED BY SECTION 1519 OF THE BANKRUPTCY CODE ..................................................................... 15

V.    THE FOREIGN REPRESENTATIVE SATISFIES THE REQUIREMENTS OF SECTION 1519 ................................................................................ 17

    A.    Irreparable Harm Would Result from Denial of the Provisional Relief .............. 19

    B.    The Foreign Representative Is Likely to Succeed on the Merits of Its Request for Recognition ............................................................... 21

    C.    Granting the Provisional Relief Will Not Result in Greater Harm to Nonmoving Parties ....................................................................... 24

    D.    The Public Interest Favors Granting the Provisional Relief ................... 26

VI.    IN THE ALTERNATIVE, THE COURT SHOULD GRANT THE SPANISH COURT COMITY AND IMPOSE PROVISIONAL RELIEF ......................... 27

VII.    CONCLUSION ................................................................................ 31

# TABLE OF AUTHORITIES

**Page(s)**

Cᴀꜱᴇꜱ

*Am. Film Techs v. Taritero (In re Am. Film Techs.),*
   175 B.R. 847 (Bankr. D. Del. 1994) ....................................................................26

*Cornfeld v. Inv. Overseas Servs., Ltd.,*
   471 F. Supp. 1255 (S.D.N.Y. 1979)...................................................................27

*Crissman v. Dover Downs Entm't Inc.,*
   239 F.3d 357 (3d. Cir. 2001)...............................................................................19

*Gathering Rest., Inc. v. First Na'l Bank of Valparaiso (In re Gathering Restr., Inc.),*
   79 B.R. 992 (Bankr. N.D. Ind. 1986) ..................................................................26

*Hilton v. Guyot,*
   159 U.S. 113 (1895)...............................................................................................29

*In re Adelphia Comm'cns Corp.,*
   368 B.R. 140 (Bankr. S.D.N.Y. 2007) .................................................................26

*In re Angiotech Pharmaceuticals, Inc.,*
   No. 11-10269 (Bankr. D. Del. Jan. 31, 2011) ...................................................17

*In re Arctic Glacier,*
   Case No. 12-10605 (Bankr. D. Del. Feb. 23, 2012) ............................................17

*In re Banco Nacional de Obras y Servicios Publicos, S.N.C.,*
   91 B.R. 661 (Bankr. S.D. N.Y. 1988)..................................................................20

*In re Catalyst Paper Corp.,*
   No. 1240221 (Bankr. D. Del. Feb.1, 2012)........................................................17

*In re Crystallex Int'l Corp.,*
   Case No. 11-14074 (Bankr. D. Del. Dec. 23, 2011) ............................................17

*In re Destinator Tech. Inc.,*
   No. 08-11003 (Bankr. D. Del. May 23, 2008) ....................................................17

*In re Innua Canada Ltd.,*
   Case No. 0946362, 2009 WL 1025088 (Bankr. D.N.J. Mar. 25, 2009) ............17, 25

*In re Irish Bank Resolution Corp. Ltd. (In Special Liquidation),*
   Case No. 13-12159 (CSS) (Bankr. D. Del. Oct. 10, 2013)...............................19, 25

*In re Lazarus Burman Assocs.*,
  161 B.R. 891 (Bankr. E.D. N.Y. 1993)..................................................................26

*In re Lee*,
  348 B.R. 799 (Bankr. W.D. Wash. 2006) ...........................................................18

*In re Lines*,
  81 B.R. 267 (Bankr. S.D. N.Y. 1988) .................................................................20

*In re Metinvest B.V.,*
  Case No. 16-10105 (Bankr. D. Del. Jan. 29, 2016) ............................................16

*In re Netia Holdings, S.A.*,
  278 B.R. 344 (Bankr. S.D. N.Y. 2002)................................................................21

*In re NewSat Limited, et al.,*
  Case No. 15-10810 (Bankr. D. Del. May 1, 2015) .............................................16

*In re Pro-Fit Int'l Ltd.*,
  391 B.R. 850 (Bank C.D. Cal. 2008) .............................................................16, 18

*In re Worldwide Educ. Servs., Inc.,*
  494 B.R. 494 (Bankr. C. D. Calif. 2013) ............................................................18

*JP Morgan Chase Bank v. Altos Hornos de Mexico, S.A. de C.V.*,
  412 F.3d 418 (2d Cir. 2005)................................................................................29

*Kos Pharmaceuticals, Inc. v. Andrx Corp.*,
  369 F.3d 700 (3d Cir. 2004)................................................................................24

*Laker Airways Ltd. v. Sabena, Belg. World Airlines*,
  731 F.2d 909 (D.C. Cir. 1984)......................................................................29, 30

*New Jersey Retail Merchants Ass'n v. Sidamon-Eristoff*,
  669 F.3d 374 (3d Cir. 2012)................................................................................19

*Opticians Ass'n of Am. v. Indep. Opticians of Am.*,
  920 F.2d 187 (3d Cir. 1990)................................................................................25

*Overseas Inns S.A. P.A. v. United States*,
  911 F.2d 1146 (5th Cir. 1990) ............................................................................29

*Rehabworks, Inc. v. Lee (In re Integrated Health Servs, Inc.)*,
  281 B.R. 231 (Bankr. D. Del. 2002) ...................................................................26

*Victrix S.S. Co., S.A. v. Salen Dry Cargo A.B.,*
  825 F.2d 709 (2d Cir. 1987)..........................................................................16, 20

STATUTES

11 U.S.C. §103(a) ................................................................................................15

11 U.S.C. § 105 ..................................................................................................28

11 U.S.C. § 105(a) ..............................................................................................15

11 U.S.C § 306 ...................................................................................................15

11 U.S.C. § 362 ............................................................................................ passim

11 U.S.C. § 363 ..................................................................................................23

11 U.S.C. § 365(e) .............................................................................................16

11 U.S.C. § 552 ..................................................................................................23

11 U.S.C. § 1501 ................................................................................................26

11 U.S.C. §1501(a) ................................................................................16, 21, 27

11 U.S.C. § 1501(a)(1) .......................................................................................15

11 U.S.C. § 1507 ................................................................................................28

11 U.S.C. § 1508 ................................................................................................27

11 U.S.C. § 1510 ................................................................................................15

11 U.S.C. § 1515 ................................................................................................22

11 U.S.C. § 1515(b) ...........................................................................................22

11 U.S.C. § 1515(c) ...........................................................................................22

11 U.S.C. § 1515(d) ...........................................................................................22

11 U.S.C. § 1516(b) ...........................................................................................22

11 U.S.C. § 1517 ...........................................................................................14, 22

11 U.S.C. § 1517(a) ...........................................................................................14

11 U.S.C. § 1519 ......................................................................................... *passim*

11 U.S.C. § 1519(a) ...........................................................................................16

11 U.S.C. § 1519(a)(2) .......................................................................................23

11 U.S.C. § 1519(a)(3) ........................................................................15, 23

11 U.S.C. § 1519(e) ............................................................................17, 18

11 U.S.C. § 1520 ...............................................................................14, 24

11 U.S.C. § 1520(a) ................................................................................14

11 U.S.C. § 1520(a)(1) ........................................................................22, 23

11 U.S.C. § 1520(a)(2) ............................................................................24

11 U.S.C. § 1520(a)(3) ............................................................................23

11 U.S.C § 1520(c) .................................................................................15

11 U.S.C. § 1521 ....................................................................................24

11 U.S.C. § 1521(a)(3) ............................................................................24

11 U.S.C. §1521(a)(5) .............................................................................23

11 U.S.C. § 1521(a)(7) ............................................................................16

11 U.S.C. § 1521(e) ................................................................................18

11 U.S.C. § 1522(a) ................................................................................24

## OTHER AUTHORITIES

Burton Lifland, *Chapter 15 of the United States Bankruptcy Code: An Annotated Section-By-Section Analysis*, in CROSS-BORDER INSOLVENCY AND CONFLICT OF JURISDICTIONS A US-EU EXPERIENCE (Georges Affaki, ed. 2007) ........................................28

FED. R. BANK 1007(a)(4) ..........................................................................22

FED. R. BANK. P. 2002 (q) .........................................................................14

Hon. Louise DeCarl Adler, *Managing the Chapter 15 Cross-Border Insolvency Case: A Pocket Guide for Judges* (Fed. Jud. Ctr. 2014)........................................14

*Note: The Extension of Comity to Foreign Bankruptcy Proceedings:* Philadelphia Gear Corp. v. Philadelphia Gear de Mexico, S.A., 20 N.C. J. INT'L L. & COMM. REG. 629 (1995) ........................................................................................30

6A NORTON BANKR. L. & PRAC. 2d § 152:16 (1997-98).................................29

Samuel L. Bufford, UNITED STATES INTERNATIONAL INSOLVENCY LAW 2008-2009 (2009).................................................................................28, 30

Christopher Morris, in his capacity as the duly authorized foreign representative (the **"Foreign Representative"**) of foreign debtors, Abengoa, S.A. and its related subsidiaries and affiliates (the **"Foreign Debtors"**), in a foreign proceeding (the **"Spanish Proceeding"**) pending in the Mercantile Court in Seville, Spain (the **"Spanish Court"**), by and through his undersigned counsel, respectfully submits this memorandum of law (**"Memorandum of Law"**) in support of the *Emergency Motion for Provisional Relief* (the **"Emergency Motion"**) and incorporates the *Declaration of R. Craig Martin Regarding Determination of Foreign Law* ("**Martin Declaration**") and the *Declaration of Borja Fernández de Troconiz in Support of Verified Petition Under Chapter 15 for Order and Final Decree Granting Recognition of Foreign Main Proceedings and Permanent Injunctive and Other Related Relief* (the "**Fernández Declaration**").   In support of the Emergency Motion, the Foreign Representative states as follows:

**I.**
**<u>PRELIMINARY STATEMENT</u>**

The Foreign Representative has commenced these cases by filing the official form petitions [D.I. 1] and *Verified Petition Under Chapter 15 for Order and Final Decree Granting Recognition of Foreign Main Proceedings and Permanent Injunctive and Other Related Relief* (collectively, the **"Petition"**) to effect and ensure the fair, efficient, and centralized administration of the Spanish Proceeding, the main goal of which is to provide the Foreign Debtors with a stable platform to reach an agreement with their financial creditors on the global restructuring of the Foreign Debtors' indebtedness, as well as to protect and maximize the value of the Foreign Debtors' assets and protect the interests of all creditors and other interested parties, including the Foreign Debtors.

To achieve these ends, prior to the hearing on recognition and relief in aid of the Spanish Proceeding, certain provisional relief from this Court is necessary. As more fully described below, among other things, certain litigation pending against the Foreign Debtors in the United States must be stayed, particularly that is pending against the Abengoa, S.A., the other Foreign Debtors' ultimate parent. The Foreign Representative also petitions to impose a temporary moratorium against creditor actions, currently being imposed contractually by the Standstill Agreement (defined below) on a certain group of the Foreign Debtors' principal financial creditors that support the standstill, to any dissenting creditors once the Standstill Agreement is homologated in the Spanish Proceeding; in other words, the Foreign Debtors need to preserve the *status quo ante* for the next twenty-one days or to such time thereafter as the Court may conduct the final recognition hearing. This temporary moratorium against creditor action will provide the stability necessary for the Foreign Debtors to obtain recognition of the Spanish Proceedings, enabling them to negotiate and finalize a restructuring of their indebtedness and preserve operations for the benefit of all stakeholders. If the standstill is not enforced on a provisional basis, the Foreign Debtors could face adverse creditor actions in the United States, pending resolution of the Petition. Indeed, the principal purpose of the Spanish Proceeding is to homologate the Standstill Agreement, thereby extending the creditor action moratorium under the Standstill Agreement to the dissenting creditors in Spain. Accordingly, the Foreign Representative believes the relief sought in the Emergency Motion is critical to align these chapter 15 cases with the Spanish Proceeding and breach the gap in protection arising from the twenty-one day notice period for the Petition required by the Federal Rules of Bankruptcy Procedure (the **"Bankruptcy Rules"**).

As demonstrated in this Memorandum of Law and the various papers filed in these chapter 15 cases, the Foreign Representative is likely to prevail in obtaining final recognition of the Spanish Proceeding as a foreign main proceeding.  As a result, the Foreign Representative will be entitled upon recognition to the relief he seeks by this Emergency Motion.  Accordingly, the Foreign Representative respectfully requests that for the reasons set forth below, the Court enter the order attached as Exhibit A to the Emergency Motion.

## II.
## FACTUAL BACKGROUND

### A.    The Company's Business and Operations

Abengoa, S.A., was incorporated in Seville, Spain on January 4, 1941, as a limited liability company and was transformed into a limited liability corporation (a "sociedad anónima" or "S.A." in Spain) on March 20, 1952.  As of the end of 2015, Abengoa, S.A. was the parent company of 687 other companies around the world, including 577 subsidiaries, 78 associates, 31 joint ventures, and 211 Spanish partnerships (*uniones temporales de empresa*) (collectively, the "**Abengoa Group**").  Additionally, the Abengoa Group held a number of other interests of less than 20% in other entities.

The Abengoa Group is a leading engineering and clean technology company with operations in more than 50 countries worldwide that provides innovative solutions for a diverse range of customers in the energy and environmental sectors.  Over the course of the Abengoa Group's 70-year history, it has developed a unique business model that applies its accumulated engineering expertise to promoting sustainable development solutions, including delivering new methods for generating solar power, developing biofuels, producing potable water from seawater, and efficiently transporting electricity.  A cornerstone of the Abengoa Group's

business model has been investment in proprietary technologies, particularly in areas with relatively high barriers to entry.

The Abengoa Group is principally an applied engineering and equipment manufacturer, providing integrated project solutions to customers in the following sectors: energy, telecommunications, transport, water utilities, environmental, industrial, and services.  The company supplies engineering projects under the 'turnkey' contract modality and operates assets that generate renewable energy, produce biofuel, manage water resources, desalinate sea water, and treat sewage.  The Abengoa Group's business is organized under the following three activities:

> ➤ *Engineering and construction*: includes the traditional engineering activities in the energy and water sectors, with more than 70 years of experience in the market and the development of solar technology.  The Abengoa Group is specialized in carrying out complex turnkey projects for thermo-solar plants, solar-gas hybrid plants, conventional generation plants, biofuels plants and water infrastructures, as well as large-scale desalination plants, and transmission lines, among others.

> ➤ *Concession-type infrastructures*: groups together the company's extensive portfolio of proprietary concession assets that generate revenues governed by long-term sales agreements, such as take-or-pay contracts, tariff contracts, or power purchase agreements.  This activity includes the operation of electric energy generation plants (solar, cogeneration, or wind), desalination plants, and transmission lines.  These assets generate low demand risk, and the company focuses on operating them as efficiently as possible.

> ➤ *Industrial production*: covers Abengoa Group's businesses with a high technological component, such as development of biofuels technology. The Company holds an important leadership position in these activities in the geographical markets in which it operates.

The Abengoa Group's core areas of operation are the development, design, and construction on an engineering, procurement, and construction ("**EPC**") basis of renewable energy (solar, wind, ethanol, biodiesel, and biomass) plants; power transmission lines; conventional energy (co-generation and combined cycle) plants; water treatment, desalination plants, other hydraulic infrastructures and industrial installations. These operations are divided into six business segments -- (i) Solar Energy, (ii) Transmission and Installation, (iii) Biofuels, (iv) Power Plants, (v) Water Infrastructure, and (vi) Maintenance and Services.

**B.**    **The Company's Capital Structure**

The Abengoa Group reports its financial information on a consolidated, condensed basis. As of December 31, 2015, the company had total assets of approximately €16.6 billion, including its goodwill, with revenues of approximately €5.8 billion, and a total loss for 2015 of about €1.3 billion. For that same period, the Abengoa Group has total non-current liabilities of about €1.3 billion, including €503 million of project debt, about €130 million in corporate financing (borrowings, financial lease liabilities, and other loans and borrowings). The company's current liabilities total approximately €14.6 billion, comprised of approximately €6.2 billion in corporate financing, project debt of €2.6 billion, borrowings of about €2.3 billion, various notes and bonds of €3.3 billion, financial lease liabilities of about €17 million, and other loans and borrowings of approximately €557 million. The Abengoa Group also has trade payables and other current liabilities as of December 31, 2015 of about €4.3 billion.

As of December 31, 2015, the share capital of the company amounts to approximately €1.8 billion, corresponding to 941,533,858 shares completely subscribed and disbursed, divided into two distinct classes, as follows: (i) 83,467,081 class A shares with a nominal value of €0.02 each, all in the same class and series, each of which grants the holder a total of 100 voting rights ("**Class A Shares**"), and (ii) 858,066,777 class B shares with a nominal value of €0.0002 each, all in the same class and series, each of which grants one (1) voting right and which affords its holder economic rights identical to the economic rights of Class A shares as stated in article 8 of the company's by-laws ("**Class B Shares**").  The Abengoa Group's shares are represented by the Class A Shares and the Class B Shares, which are listed on the Madrid and Barcelona stock exchanges and on the Spanish Stock Exchange Electronic Trading System (Electronic Market). The Class A Shares have been listed since November 29, 1996, and the Class B Shares have been listed since October 25, 2012.  Additionally, the Class B Shares are also listed on the NASDAQ Global Select Market in the form of American Depositary Shares following the capital increase carried out on October 17, 2013.  The company presents mandatory financial information quarterly and semi-annually.

A true and correct copy of the Abengoa Group's Consolidated Condensed Financial Statements as of December 31, 2015, is attached to the Martin Declaration as Exhibit 1.

**C.**      **Events Leading to the Filing of the Spanish Proceeding**

During 2015, various factors, such as an insufficient upswing in the market in which the Abengoa Group operates and the difficulty of obtaining financing, precluded compliance with the company's business plan, which caused imbalances in cash flow.  To address these issues, the Abengoa Group's Board of Directors submitted a proposed capital increase with preferential subscription rights in the amount of €650 million to the General Meeting of Shareholders.  The

company began a period of negotiation with a number of financial institutions to reach an agreement on September 24, 2015 to ensure the announced capital increase.

In early November 2015, the Abengoa Group announced that it entered into a framework agreement with Gonvarri Corporación Financiera, a company in the Gonvarri Steel Industries group ("**Gonvarri**"), with the support of the company's main shareholder, which set out terms and conditions for an investment by Gonvarri of €250 million through an increase in the share capital of Class A Shares and Class B Shares.  This agreement was subject to certain conditions such as continuance of an existing standby underwriting of the share capital and the signing of a substantial package of financial support in favor of the company by a group of financial institutions.  Under this framework agreement, Gonvarri expected to have a percentage of voting rights after the share capital increases equal to 28% of all of the voting rights of the company, making Gonvarri the main shareholder of the Abengoa Group.

On November 25, 2015, the Abengoa Group informed the Spanish Securities Market Commission (*Comisión Nacional del Mercado de Valores)* that it had received notice from Gonvarri that the framework agreement was terminated due to the failure of certain conditions. As no other proposal was received from any other potential subscriber that would immediately replace Gonvarri, the company decided to initiate a refinancing process to try and reach an agreement with its main financial creditors, aimed to establish the framework to carry out such negotiations and provide the Abengoa Group with financial stability in the short and medium term.  After a careful assessment of the situation and in order to provide the stability needed to carry out such negotiations with creditors, the Abengoa Group's Board of Directors further announced that it would continue negotiations with its creditors with the objective of reaching an

agreement that ensures the company's financial viability, under the protection of article 5 bis of the Spanish Insolvency Law (*Ley Concursal).*

**D.**     **The Foreign Proceeding and the Appointment of the Foreign Representative**

*The 5 Bis Proceedings*

On several dates thereafter (November 25, 2013, December 3, 15, and 28, 2015, January 27, 2016, and February 1, 2016), Abengoa, S.A. and certain of its direct and indirect subsidiaries and affiliates (collectively, the **"5 bis Companies"**) filed notice with the Spanish Court that they had commenced negotiations with their principal creditors in order to reach a global agreement on the refinancing and restructuring of their liabilities to achieve the viability of the Abengoa Group in the short and long term.  The Spanish Court issued orders on December 14 and 22, 2015, and January 15, 2016, admitting the notice and granting the Article 5 bis Companies with the protection of the law of 22/2003, of July 9, on insolvency. (*See* Official Form Petition, Exh. D.)

The Abengoa Group commenced negotiations with a large and diverse number of its main financial creditors, including a group of lenders that formed a coordinating committee, advised by Sullivan & Cromwell LLP, Uria Menendez, and KPMG, and an *ad hoc* committee of bondholders, advised by Clifford Chance and Houlihan Lokey.  The Abengoa Group, advised by Linklaters, Alvarez & Marsal, Lazard and, Cortés, Abogados,[2] began preparing a business viability plan and the terms of a possible restructuring agreement.  During this period, the

---

[2]     Alvarez & Marsal was retained by Abengoa, S.A. to advise the Abengoa Group on its global restructuring, the primary task of which has been to prepare a viability plan; however, in so doing, Alvarez & Marsal has performed work for various members of the Abengoa Group around the world, including, within the United States. Thus, Alvarez & Marsal will continue performing such services under its engagement with Foreign Debtor, Abengoa, S.A., and in the orders seeking provisional and final relief, the Foreign Debtors seek acknowledgment of this work by Alvarez & Marsal.  With respect to the legal services rendered by Linklaters and Cortés, Abogados on behalf of the Foreign Debtors, those firms will continue to provide those services for Abengoa S.A.; however, DLA Piper LLP (US) has been retained for the U.S. debtors and the Foreign Debtors to provide legal services in connection with the U.S.-aspects of the Abengoa Group's global restructuring.

Abengoa Group negotiated the following facilities during the negotiation process to fund its general liquidity needs:

- A €125,000,000 syndicated facility agreement dated 23 September 2015 between the Abengoa Group, as borrower, and certain companies of its group as guarantors and certain finance entities (the "**Revolving Facilities**");

- A €106,000,000 facility agreement dated 24 December 2015 between Abengoa Concessions Investment Limited ("**ACIL**"), as borrower, certain companies its group as guarantors and certain finance entities (the "**December Facility**").  The December Facility was used for general corporate purposes, and the Abengoa Group granted a security interest over certain shares of Abengoa Yield plc ("**YieldCo**") (and at this time also pledged YieldCo shares as security for the Revolving Facilities);

- A €135,000,000 secured term facility agreement dated 22 October 2015 between ACIL, as borrower, and Talos Capital Limited; and

- A €137,226,746.96 facility agreement dated 16 March 2016 between ACIL, as borrower, certain companies of its group as guarantors and certain finance entities (the "**Bondholders Facilities**").  The Bondholders Facilities was used for general corporate purposes, and the Abengoa Group granted a security interest over certain shares of YieldCo.

Alvarez & Marsal prepared a Viability Plan based on a preliminary review of specific projects, the existing project pipelines, and the most recent information and thinking with respect to asset disposals and financial debt.  As part of this evaluation, Alvarez & Marsal evaluated (i) 200 projects, each above €2.5 million that covered 90% of the Abengoa Group's

€8.6 billion backlog as of December 31, 2015, and (ii) each business line by region and operating division with the head of each business line.

On December 30, 2015 and January 25, 2016, Alvarez & Marsal presented the Board of Directors of the Abengoa Group with viability plans that defined the structure of the future activity of the Abengoa Group. This Viability Plan was presented to the public in a conference call held on Wednesday, February 17, 2016. In broad general terms, this Viability Plan analyzed the old Abengoa Group, proposed a new business model for a new Abengoa Group, presented both valuation and cash flows, risks and opportunities, and set forth certain recommendations and conclusions as to the viability of the proposed new Abengoa Group. This plan did not contain a financial restructuring proposal but was an operational plan. A true and correct copy of this Viability Plan is attached to the Martin Declaration as Exhibit 2.

In relation to the negotiations between the company and a group of its creditors comprised of banks and holders of bonds issued by the Abengoa Group, the company announced on March 10, 2016, that it had agreed with the advisers of such creditors on the basis of an agreement to restructure the financial indebtedness and recapitalize the group. The company believes that such agreement contains the essential elements to achieve a future restructuring agreement that, in any event, will be subject to reaching the percentage of accessions required by law. The fundamental principles of the agreement announced on March 10 were the following:

i) New money would be lent to the company in a range between €1.5 billion and €800 million for a maximum term of 5 years. Creditors would be entitled to 55% of the share capital. This financing would rank senior with respect to the existing debt and would be guaranteed by certain assets, including unpledged shares of YieldCo.

ii) The amount of the old debt that would be capitalized would correspond to 70% of its nominal value.  Such capitalization grants the right to subscribe 35% of the new share capital.

iii) The financial indebtedness corresponding to Revolving Lines and the December Facilities (a total amount of €231 million (plus accrued financial expenses)) will be subject to refinancing by extending the term by 2 years.  This indebtedness would be secured by the shares of YieldCo and would be prepaid in case of sale of the shares of YieldCo.

iv) The amount of the share capital increase that would be reserved to those creditors, who provide €800 million of the bank guarantees requested, would be 5% of the new capital.

On March 16, 2016, the Abengoa Group presented its Business Plan & Financial Restructuring Plan in Madrid and permitted public participation by telephone.  At this presentation, Alvarez & Marsal presented the Viability Plan, and Lazard presented the Restructuring Proposal.  The Banks' advisors, KPMG, and the Bondholders' advisor, Houlihan Lokey, presented their key conclusions regarding the Viability Plan and Restructuring Proposal.  The Abengoa Group's Spanish law firm, Cortés, Abogados set forth the company's plan for presenting a standstill agreement to all financial creditors between March 18 and 27, 2016.  A true and correct copy of this presentation is attached to the Martin Declaration as Exhibit 4.

*The Standstill Agreement Homologation Proceeding*

While the Restructuring Proposal presented on March 16, 2016 sets forth the framework for the restructuring of the Abengoa Group, in order for the Spanish Court to homologate such proceeding in accordance with the Spanish Insolvency Law, 75% of the requisite creditors need

to accede to the agreement. (*See* Fernández Decl. ¶¶ 8-11.) In order to permit the Abengoa Group with sufficient time to solicit and obtain the requisite supermajority votes with respect to the Restructuring Proposal, the Abengoa Group requested its financial creditors to adhere to a standstill agreement (the "**Standstill Agreement**") under which the Abengoa Group companies that are signatories to the Standstill Agreement will request its financial creditors to stay certain rights and actions vis-à-vis the relevant Abengoa companies during a period of seven months from the date of the Standstill Agreement. (*See* Fernández Decl., Exh. B.) The Abengoa Group advised creditors that once the Standstill Agreement is signed by 60% of the company's various financial creditors, the Abengoa Group intended to apply for judicial approval (*homologación judicial*) of the Standstill Agreement pursuant to the Spanish Insolvency Act, so that the Standstill Agreement becomes binding upon all the relevant financial creditors of the company, including those who do not enter into it in Spain.

The company requested that the beneficial owners of the affected bond issues[3] indicate their accession to the Standstill Agreement through a standstill accession notice (the "**Standstill Accession Notice**") that was made available for the beneficial owners of the Notes through

---

[3]        Those affected issues were the following: (a) Abengoa, S.A.'s €500,000,000 8.50 per cent Notes due 2016 (ISIN: XS0498817542); (b) Abengoa, S.A.'s €250,000,000 4.50% Senior Unsecured Convertible Notes due 2017 (ISIN: XS0481758307); (c) Abengoa, S.A.'s €400,000,000 6.25% Senior Unsecured Convertible Notes due 2019 (Rule 144A Notes ISIN: XS0875624925; Regulation S Notes ISIN: XS0875275819); (d) Abengoa, S.A.'s US$279,000,000 5.125% Exchangeable Notes due 2017 (Rule 144A Notes ISIN: US00289RAD44, CUSIP: 00289RAD4; Regulation S Notes ISIN: XS1196424698); (e) Abengoa Finance, S.A.U.'s US$650,000,000 8.875% guaranteed Senior Notes due 2017 (Rule 144A Notes ISIN: US00289RAA05, CUSIP: 00289RAA0; Regulation S Notes ISIN: USE0002VAC84, CUSIP: E0002VAC8); (f) Abengoa Finance, S.A.U.'s €550,000,000 8.875% guaranteed Senior Notes due 2018 (Rule 144A Notes ISIN: XS0882238024; Regulation S Notes ISIN: XS0882237729); (g) Abengoa Greenfield, S.A.'s €265,000,000 5.500% guaranteed Senior Notes due 2019 (Rule 144A Notes ISIN: XS1113024563; Regulation S Notes ISIN: XS1113021031); (h) Abengoa Greenfield, S.A.'s US$300,000,000 6.500% guaranteed Senior Notes due 2019 (Rule 144A Notes ISIN: US00289WAA99, CUSIP: 00289WAA9; Regulation S Notes ISIN: USE00020AA01, CUSIP: E00020AA0); (i) Abengoa Finance, S.A.U.'s US$450,000,000 7.750% guaranteed Senior Notes due 2020 (Rule 144A Notes ISIN: US00289VAB99, CUSIP: 00289VAB9; Regulation S Notes ISIN: USE0000TAE13, CUSIP: E0000TAE1); (j) Abengoa Finance, S.A.U.'s €375,000,000 7.000% guaranteed Senior Notes due 2020 (Rule 144A Notes ISIN: XS1219439137; Regulation S Notes ISIN: XS1219438592); and (k) Abengoa Finance, S.A.U.'s €500,000,000 6.000% guaranteed Senior Notes due 2021 (Rule 144A Notes ISIN: XS1048658105; Regulation S Notes ISIN: XS1048657800).

Lucid Issuer Services Limited.  The Abengoa Group indicated that, with respect to the remaining financial creditors, execution of the agreement would commence on March 18, 2016, before a Spanish notary public, and remain open until March 27, between 9:30 a.m. and 7 p.m. every business day and up until 2 p.m. during bank holidays in Madrid.  Financial creditors could also accede to the Standstill Agreement by appearing before any notary public and signing the "Accession Letter" (a model of which is attached to the Standstill Agreement).  (*See* Fernández Decl. ¶¶ 21-22 & Exh. B.)

The Standstill Accession Notice established the deadline of 12 p.m. (Spanish time) on 23 March 2016, unless extended, for submission by the beneficial owners of instructions to enter into, and therefore, sign and execute, the Standstill Agreement.  As of March 28, 2016, more than the necessary consents by value of the creditors holding the debt affected by the Standstill Agreement to permit commencement of a Judicial Confirmation Request to apply the Standstill Agreement to all of the holders of that debt acceded to the Standstill Agreement.

On March 28, 2016, the Foreign Debtors and certain other members of the Abengoa Group filed the Judicial Confirmation Request for homologation of the Standstill Agreement. On that same day, the clerk of the Spanish Court published a resolution *(Providencia)* of the Spanish Court accepting the jurisdiction over the Judicial Confirmation Request and imposing a moratorium on enforcement actions against the Foreign Debtors.  A true and correct copy of the certified initial request submitted to the Spanish Court and the decree commencing the Spanish Proceeding is attached as Exhibit E to the Official Form Petition.

### E.    The Chapter 15 Filing

As contemplated by the Standstill Agreement, the Foreign Debtors seek cross-border recognition of the Spanish Proceeding to extend the Standstill Agreement with respect to the Foreign Debtors within the territorial jurisdiction of the United States of America.  Additionally,

the Foreign Debtors seek by this Petition entry of an order prohibiting the commencement or continuation of any action prohibited by the Standstill Agreement within the territorial jurisdiction of the United States and further seeks relief related to the recognition of the Spanish Proceeding as set forth herein.

**III.**
**THE COURT SHOULD GRANT THE PROVISIONAL RELIEF**
**REQUESTED UNDER SECTION 1519 OF THE BANKRUPTCY CODE**

Upon recognition of the Spanish Proceeding as a foreign main proceeding, the Foreign Representative and the Foreign Debtors will be entitled to entry of an order providing them with various forms of relief, including, but not limited to that available under section 1520 of the Bankruptcy Code, such as enforcement of the automatic stay and the authority to dispose of assets in the United States.  *See* 11 U.S.C. § 1520(a).  Section 1517 of the Bankruptcy Code provides that an order recognizing a foreign proceeding may only be entered after notice and a hearing, and Bankruptcy Rule 2002(q) provides that the notice period for a chapter 15 petition must be at least twenty-one days.  11 U.S.C. § 1517(a); FED. R. BANK. P. 2002 (q).  Until such time and absent provisional relief, there is no stay applicable in the United States during the period between filing the chapter 15 petition and entry of a recognition order.  *See generally* Hon. Louise DeCarl Adler, *Managing the Chapter 15 Cross-Border Insolvency Case:  A Pocket Guide for Judges* (Fed. Jud. Ctr. 2014), at 4.  Accordingly, until the Court enters an order recognizing the Spanish Proceeding, the Foreign Debtors urgently require provisional relief to enable them to protect and preserve the value of their assets located in the United States, preserve the centralized administration of their estates, promote efficiency of the restructuring process, and enable them to continue focusing on reaching a global restructuring agreement with their creditors.  Without the certainty that the automatic stay protection can provide, the Foreign Debtors are at risk of facing harmful, individualized actions by creditors, potentially causing

major disruption of the Foreign Debtors' reorganization taking place in the Spanish Proceeding. The purpose of chapter 15 is to prevent exactly such harm. *See* 11 U.S.C. § 1501(a)(1).

Without the provisional relief, the Foreign Debtors' months-long restructuring efforts with many of their creditors may be subject to interference, undermining the Spanish Proceeding and increasing cost and creating unnecessary stress and distraction on the Foreign Debtors' restructuring efforts in Spain. Therefore, by the Emergency Motion, the Foreign Representative requests that this Court grant provisional relief, including (1) staying the commencement or continuation of any and all acts against the Foreign Debtors and their assets including, without limitation, execution against the Foreign Debtors' assets, within the territorial jurisdiction of the United States; (2) entrusting the administration or realization of all or part of such assets located within the territorial jurisdiction of the United States to the Foreign Debtors in order to protect and preserve estates' value; (3) suspending the right to transfer, encumber, or otherwise dispose of any assets of the Foreign Debtors other than by or upon the written authorization of the Foreign Debtors; and (4) granting the Foreign Representative protections under sections 306 and 1510 of the Bankruptcy Code. This provisional relief requested is both authorized and warranted under the Bankruptcy Code.

## IV.
### THE PROVISIONAL RELIEF IS AUTHORIZED BY SECTION 1519 OF THE BANKRUPTCY CODE

The Bankruptcy Code authorizes certain relief for a foreign debtor, including extending section 362 of the Bankruptcy Code to a foreign debtor during the period between filing the petition and when the petition for recognition is granted. 11 U.S.C. §§ 1519(a)(3) & 1521(a)(7).[4]

---

[4]  In addition, section 105(a) of the Bankruptcy Code, made applicable in Chapter 15 cases by section 103(a) of the Bankruptcy Code, grants the Court the power to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [title 11]." Such provisions include the purpose and intent of Chapter 15.

Under chapter 15, though such relief is not automatic upon filing, the Court has discretion to grant such relief on a provisional basis. *See In re Pro-Fit Int'l Ltd.*, 391 B.R. 850, 864 (Bank C.D. Cal. 2008) ("Unlike cases filed under other chapters of the U.S. bankruptcy code, the filing of a Chapter 15 Petition does not automatically impose a stay on creditor collection efforts.") (citation omitted).

The success of the Foreign Debtors' efforts to negotiate a comprehensive restructuring and preserve their estates' value will depend in large part on cooperation from multiple creditor constituencies across many jurisdictions.  To be in the best position to achieve a global restructuring, the Foreign Debtors must maintain operations, have a stable platform to continue negotiating with each of these creditors, and avoid a race to the courthouse in one part of the world by some creditors to obtain advantage over other creditors perhaps in a different part of the world.  *Victrix S.S. Co., S.A. v. Salen Dry Cargo A.B.,* 825 F.2d 709, 714 (2d Cir. 1987) ("The equitable and orderly distribution of a debtor's property requires assembling all claims against the limited assets in a single proceeding; if all creditors could not be bound, a plan of reorganization would fail.").  Accordingly, the Foreign Representative seeks provisional relief during the disposition of the Petition to enforce the Standstill Agreement to be homologated by the Spanish Court, thereby extending it to the United States.

Courts, including those in this district, have granted similar provisional relief pursuant to section 1519(a) of the Bankruptcy Code in a number of chapter 15 cases. *See, e.g., In re Metinvest B.V.,* Case No. 16-10105 (Bankr. D. Del. Jan. 29, 2016) (granting temporary moratorium on creditor action to allow the debtor to negotiate and finalize its contemplated restructuring); *In re NewSat Limited, et al.,* Case No. 15-10810 (Bankr. D. Del. May 1, 2015)

---

*See* 11 U.S.C. §1501(a).  The provisional relief requested by the Foreign Representative is critical to realizing such purpose and intent and, thus, is also authorized by this grant of power.

(granting temporary restraining order on first day of the case to avoid irreparable harm to restructuring efforts); *In re Arctic Glacier,* Case No. 12-10605 (Bankr. D. Del. Feb. 23, 2012) (order granting provisional relief, including protections of the automatic stay); *In re Catalyst Paper Corp.,* No. 1240221 (Bankr. D. Del. Feb.1, 2012) (applying in a chapter 15 case sections 365(e) and 362 on a provisional basis pursuant to section 1519); *In re Crystallex Int'l Corp.,* Case No. 11-14074 (Bankr. D. Del. Dec. 23, 2011) (order granting provisional relief, including protections of automatic stay); *In re Angiotech Pharmaceuticals, Inc.,* No. 11-10269 (Bankr. D. Del. Jan. 31, 2011) (same); *In re Innua Canada Ltd.,* Case No. 0946362, 2009 WL 1025088, at *3 (Bankr. D.N.J. Mar. 25, 2009) (same); *In re Destinator Tech. Inc.,* No. 08-11003 (Bankr. D. Del. May 23, 2008) (enforcing in the United States a Canadian stay on all proceedings against chapter 15 petitioners and their business and property on a provisional basis pursuant to section 1519).[5]

## V.
## THE FOREIGN REPRESENTATIVE SATISFIES THE REQUIREMENTS OF SECTION 1519

Section 1519(e) of the Bankruptcy Code provides that "the standards, procedures, and limitations applicable to an injunction" apply when a foreign representative seeks provisional relief.  11 U.S.C. § 1519(e).  In the context of the type of relief requested in the Emergency Motion, namely the provisional stay of the commencement or continuation of any litigation against the Foreign Debtors, bankruptcy courts that grant provisional stays pending the final recognition hearing on a motion have done so without applying the full panoply of protections that would otherwise be required when traditional injunctive relief is sought.  Thus, provided a foreign debtor seeks traditional "automatic stay" type relief simply to bridge to the final recognition hearing, the injunctive standards of section 1519(e) of the Bankruptcy Code do not

---

[5]    Copies of these unpublished orders are provided as Exhibit 5 to the Martin Declaration.

impose any significant requirement and will be satisfied if the provisional relief is akin to application of the automatic stay in section 362 of the Bankruptcy Code.  Here, then, the limitations and procedural safeguards otherwise required in a standard injunctive relief are not required.  *See In re Pro-Fit Holdings*, 391 B.R. at 865 ("[T]he fact that § 362 takes effect automatically in all bankruptcy cases, except those filed under chapter 15, without the limitation or procedural safeguards of an injunction, supports the inference that these limitations and procedural safeguards are not needed when a court imposes a § 362 in a chapter 15 case on an interim basis."); *see also In re Lee*, 348 B.R. 799, 801 (Bankr. W.D. Wash. 2006) (holding under section 1521(e)'s language that is the same as section 1519(e)'s that injunctive relief could be granted on motion since the legislative history of chapter 15 did not intend to change the prior practice seeking to provisionally protect foreign insolvency proceedings from negative consequence of U.S. litigation).  In this district, the trial courts have followed the *Pro-Fit Holdings* approach and have granted provisional relief similar to that requested even when objecting parties have argued that the heightened standards of injunctive relief apply.  For example, in *In re Irish Bank Resolution Corp. Ltd. (In Special Liquidation)*, Case No. 13-12159 (CSS) (Bankr. D. Del. Oct. 10, 2013), pending in this district, certain creditors objected to entry of a provisional stay of litigation pending a hearing on final recognition based on allegations that the traditional injunctive standards had not been satisfied, specifically with respect to likelihood of success and irreparable injury, basing their argument on *In re Worldwide Educ. Servs., Inc.*, 494 B.R. 494 (Bankr. C. D. Calif. 2013).  This Court held that this approach was "too strict" and that like the *Pro-Fit Holdings* case, this Court's review of provisional relief is informed by the standards governing the automatic stay in a chapter 11.  (*See* Martin Decl., Exh. 5, Tr. at 46:16-47:3 (expressly rejecting the *Worldwide Educational Services* decision and imposing a limited

stay on litigation on the ground that the short time between the petition for chapter 15 and the final hearing would not result in preventing "anything of any real import . . . .").)  Here, the provisional relief sought by the Foreign Representative is similar to that in *Irish Bank Resolution* cases in that the Foreign Representative seeks merely to impose a stay on the commencement or continuation of any litigation, and in the context of the Abengoa Group's global restructuring, a limited stay for a month or less until a final hearing on the Petition is reasonable and well within this Court's discretion to grant.  If, however, this Court does impose the injunctive relief standards to the Emergency Motion, the Foreign Representative submits that those standards are also satisfied.

The Third Circuit has established four factors for trial courts to consider when determining whether to grant injunctive relief: "(1) whether the movant has shown a reasonable probability of success on the merits; (2) whether the movant will be irreparably injured by denial of the relief; (3) whether the relief requested will result in even greater harm to the nonmoving party; and (4) whether granting preliminary relief is in the public interest."  *New Jersey Retail Merchants Ass'n v. Sidamon-Eristoff*, 669 F.3d 374, 385-86 (3d Cir. 2012) (*quoting Crissman v. Dover Downs Entm't Inc.*, 239 F.3d 357, 364 (3d. Cir. 2001)).  All four factors are met here, and the Court should grant the provisional relief.

A.       <u>**Irreparable Harm Would Result from Denial of the Provisional Relief.**</u>

If the provisional relief requested by the Foreign Representative is not granted, the Foreign Debtors and their creditors in the Spanish Proceeding will face irreparable harm.  These chapter 15 cases have been commenced for the purpose of obtaining the assistance of this Court in the United States through recognition of the Spanish Proceeding and enforcement of the Standstill Agreement and the broad creditor action moratorium imposed by the Spanish Court's homologation of the Standstill Agreement, thereby facilitating an orderly process for the

potential restructuring of the Foreign Debtors' liabilities and businesses. The Spanish Court has imposed a stay on the enforcement of action in accordance with the Standstill Agreement irrespective of whether an affected person or entity has acceded to the Standstill Agreement. (*See* Fernández Decl. ¶ 23.) Allowing parties that have not acceded to the Standstill Agreement to end-run the Spanish Court in a U.S. Court while these chapter 15 cases are pending would be unjust to the Foreign Debtors and to those creditors that are otherwise subject to the jurisdiction of the Spanish Court and cannot take such action. The Foreign Representative believes that this provisional relief in the United States is crucial to prevent efforts by dissenting creditors to collect upon their debts during the pendency of the Petition. Without such provisional relief, the Foreign Debtors could face immediate and irreparable harm resulting from the piecemeal loss of assets by collection and enforcement efforts and the inability to effectuate a potential comprehensive debt restructuring. Additionally, with respect to the Foreign Debtor, Abengoa, S.A., it has litigation pending against it that it has identified on the list of parties against whom it seeks provisional relief. (*See* Official Form Petition, Exh. B.) Abengoa, S.A. submits that the brief stay between the commencement of this case and the final hearing will prevent the harm that would arise if it is required to continue using resources and focusing on the pending litigation.

It has been consistently held that "the premature piecing out of property involved in a foreign liquidation proceeding constitutes irreparable injury." *In re Lines*, 81 B.R. 267, 270 (Bankr. S.D. N.Y. 1988). It has also been held that harm to an estate exists where the orderly determination of claims and the fair distribution of assets are disrupted. *See Victrix S.S. Co., S.A. v. Salen Dry Cargo A.B.*, 825 F.2d 709, 714 (2d Cir. 1987); *In re Banco Nacional de Obras y Servicios Publicos, S.N.C.*, 91 B.R. 661, 664 (Bankr. S.D. N.Y. 1988). In these chapter 15 cases,

allowing dissenting creditors to initiate piecemeal litigation and collection efforts against the Foreign Debtors in the United States would have an immediate and detrimental impact on the Foreign Debtors' ability to focus on its potential restructuring and to continue conducting business in the ordinary course during the pendency of the Spanish Proceeding.  Moreover, the Foreign Representative believes that such actions may have a cascading effect, prompting other creditors to pursue enforcement strategies and resulting in significant erosion in enterprise value to the detriment of stakeholders and defeating the purpose of the Spanish Proceeding.

Likewise, currently pending litigation might cause the Foreign Representative to incur significant defense and other costs, provoke attempted or successful pre- or post-judgment seizure or encumbrance of assets of the foreign estates located within the territorial jurisdiction of the United States, or worse, result in a U.S. judgment against the Foreign Debtors.  *In re Netia Holdings, S.A.*, 278 B.R. 344, 352 (Bankr. S.D. N.Y. 2002) ("It is well established, at least in this district, that the dissipation of the finite resources of an insolvent estate constitutes irreparable injury.").  Moreover, any such resolution of claims outside of the Spanish Proceeding and preferential recoveries by creditors contrary to Spanish law seriously undermine the fair and efficient administration of the Spanish estates to the detriment of the Foreign Debtors and their creditors in direct contradiction to Congress' articulated intent in enacting chapter 15.  11 U.S.C. §1501(a).

**B.**      **The Foreign Representative Is Likely to Succeed on the Merits of Its Request for Recognition.**

There is a high likelihood that the Court ultimately will grant as final relief all of the provisional relief requested by the Foreign Representative.  As set forth in the Petition and the *Memorandum of Law in Support of the Motion for Chapter 15 Recognition and Final Relief*, each of which is incorporated here in full by this reference, the Foreign Representative satisfies

the Bankruptcy Code's definition of a "foreign representative," the Spanish Proceeding satisfies the Bankruptcy Code's definition of a "foreign proceeding," and because Foreign Debtors' center of main interest is in Spain, the Spanish Proceeding is entitled to recognition as a foreign main proceeding at which time the automatic stay will apply in these cases. *See* 11 U.S.C. § 1520(a)(1).

The Foreign Debtors initiated the Spanish Proceeding in the Spanish Court by filing their request for judicial homologating on March 28, 2016, in anticipation of which the Foreign Debtors lawfully appointed the Foreign Representative with the specific purpose of petitioning for chapter 15 relief.  (Official Form Petition, Exh. E.)  The Foreign Representative respectfully submits that the Spanish Proceeding should be recognized by this Court because, as required under section 1517 of the Bankruptcy Code, the Foreign Representative is a person or body and the Petition meets the requirements of section 1515 of the Bankruptcy Code.  As required by section 1515(b) of the Bankruptcy Code, the Petition is accompanied by a certified copy of the Judicial Confirmation Request for homologation of the Standstill Agreement submitted to the Spanish Court and the decree commencing the Spanish Proceeding.  (*See* Official Form Petition, Exh. E.)  As required by section 1515(d) of the Bankruptcy Code, the Judicial Confirmation Request and the decree as well as the Standstill Agreement and the board resolutions appointing the Foreign Representative have been translated into English, and copies of those translations have been provided with the Petition.  (*See* Official Form Petition, Exhs. C & E.)  In accordance with section 1515(c) of the Bankruptcy Code and Rule 1007(a)(4) of the Federal Rules of Bankruptcy Procedure, the Foreign Representative has filed a statement identifying all foreign proceedings with respect to the Debtors that are known to the Foreign Representative, the parties

to litigation pending within the United States, and parties against which provisional relief is requested.  (*See* Official Form Petition, Exh. B.)

Thus, all of the conditions to recognition have been satisfied.  Additionally, because the Foreign Debtors' center of main interest and nerve center is in Spain, the Foreign Debtors' center of main interest is presumed to be in Spain under section 1516(b) of the Bankruptcy Code as the Foreign Debtors' registered offices are in Spain.  (*See* Fernández Decl. ¶ 23.)

Upon recognition as a foreign main proceeding, the automatic stay under section 362 of the Bankruptcy Code applies.  *See* 11 U.S.C. §§ 362, 1520(a)(1). Accordingly, the commencement or continuation of any and all acts against the Foreign Debtors or their property and assets located within the territorial jurisdiction of the United States will be stayed and enjoined, and, thus, imposing this relief now until such time as the requested relief becomes automatic is appropriate provisional relief.

The Foreign Representative also has requested that the Court entrust the administration or realization of all or part of the Foreign Debtors' assets located in the United States to the Foreign Debtors.  Upon recognition of a foreign main proceeding, unless the court orders otherwise, the court may entrust assets to the foreign representative or another person.  *See* 11 U.S.C. §1521(a)(5).  Accordingly, the Foreign Debtors will be empowered to operate their business and exercise the rights and powers of a trustee under and to the extent provided by sections 363 and 552 of the Bankruptcy Code.  11 U.S.C. § 1520(a)(3).  Section 1519(a)(2) expressly permits this relief on a provisional basis, and, thus, the Foreign Representative requests such provisional relief to best ensure the fair, efficient, and centralized administration of the Foreign Debtors' estate.

Similarly, section 1519(a)(3) of the Bankruptcy Code empowers the Court to suspend the right to transfer, encumber, or otherwise dispose of Foreign Debtors' assets by any entity or person other than the Foreign Debtors without the Foreign Debtors' written authorization.  Upon recognition of the Spanish Proceeding as a foreign main proceeding, such relief automatically applies under section 1520 of the Bankruptcy Code.  11 U.S.C. § 1520(a)(1) & (2).  Furthermore, under section 1521 of the Bankruptcy Code, the Court may grant this relief to the extent the right to transfer, encumber, or otherwise dispose of the assets has not been suspended under section 1520 of the Bankruptcy Code.  *See* 11 U.S.C. § 1521(a)(3).  To the extent such relief is not mandatory under section 1520 of the Bankruptcy Code, there is a strong likelihood that the Court will exercise its discretion under section 1521(a)(3) of the Bankruptcy Code in favor of granting this relief.  As explained above, this relief is urgently needed to protect the assets of the creditors in the Spanish Proceeding since under that Spanish Proceeding the Foreign Debtors continue to operate their business like a chapter 11 debtor and continue to exercise control over these assets. (*See* Fernández Decl. ¶ 12.)

In summary then, all of the relief proposed in the form of order attached as Exhibit "A" to the Emergency Motion is likely to be granted in connection with a final recognition order, and, thus, the Foreign Representative has a substantial likelihood of success on the merits.

## C.    <u>Granting the Provisional Relief Will Not Result in Greater Harm to Nonmoving Parties.</u>

Granting the provisional relief will not result in harm to nonmoving parties, and the interests of creditors and other entities, including the Foreign Debtors, are sufficiently protected as required by section 1522(a) of the Bankruptcy Code.  The requested provisional relief preserves the *status quo* and merely grants relief that the Foreign Representative will obtain upon recognition of the Spanish Proceeding as a foreign main proceeding.  Because the provisional

relief requested by the Foreign Representative preserves the *status quo* between the Foreign Debtors and the nonmoving parties until the disposition of the Petition, the requested provisional relief should be granted. *See Kos Pharmaceuticals, Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004) ("One of the goals of the preliminary injunction analysis is to maintain the *status quo*, as defined as the last peaceable, noncontested status of the parties.") (*quoting Opticians Ass'n of Am. v. Indep. Opticians of Am.*, 920 F.2d 187, 197 (3d Cir. 1990)); *see also In re Innua Canada Ltd.*, Case No. 09–16362 (DHS), 2009 WL 1025088, at *4 (Bankr. D. N.J. Mar. 25, 2009) (entering provisional relief to stay litigation because, among other reasons, "creditors or interested parties will not suffer significant harm or hardship because the provisional relief is temporary, pending the hearing on recognition."); *see also* discussion *supra* regarding *In re Irish Bank Resolution*. In addition, the moratorium to be imposed by the Spanish Proceeding now that the Standstill Agreement is homologated is in many ways akin to the automatic stay provided in section 362 of the Bankruptcy Code. (*See* Fernández Decl. ¶¶ 14, 23.)

There is substantial likelihood that relief similar to the provisional relief will be granted once the Spanish Proceeding is recognized as a foreign main proceeding. Any conceivable harm that could be suffered by nonparty movants resulting from the entry of an order granting provisional relief a few weeks earlier than it would otherwise apply is *de minimis*, if any harm exists at all. Moreover, any dissenting creditors that object to the relief requested will have an opportunity to be heard and may apply to this Court for relief if they believe they are harmed by the terms of this Order. By contrast, the Foreign Debtors will suffer significant injury from creditor litigation or collection efforts if the Court does not grant the relief sought by the Emergency Motion. Indeed, the Foreign Debtors' almost six-month-long negotiations with the vast body of financial creditors with the goal of global restructuring could be affected.

Therefore, granting the provisional relief would not result in significant injury to the nonmoving parties.  On the other hand, as described above, the Foreign Debtors and their Spanish creditors will be irreparably harmed by a denial of the provisional relief.  Assets of the Foreign Debtors may be impaired or dissipated to the detriment of their creditors, including U.S. creditors, and resources and management time could be taken away from the key creditor negotiation and global restructuring execution tasks.  All of such harms would be in contravention of the intents, purposes, and protections for which chapter 15 was enacted.  Consequently, the balance of hardships weighs in favor of granting the requested provisional relief.

**D.**    **The Public Interest Favors Granting the Provisional Relief.**

Granting the provisional relief is in the public interest as it furthers the purposes of chapter 15 as expressly intended by Congress.  The requested provisional relief is consistent with the policy underlying bankruptcy law and is in the public interest because it will facilitate the efforts to complete a court-supervised restructuring of the Foreign Debtors' indebtedness to preserve the business as a going concern for the ultimate benefit of the Foreign Debtors' creditors, including vendors, customers, and employees.  *See generally* 11 U.S.C. § 1501 (discussing the purpose and scope of chapter 15); *see also Rehabworks, Inc. v. Lee (In re Integrated Health Servs, Inc.),* 281 B.R. 231, 239 (Bankr. D. Del. 2002) ("In the context of a bankruptcy case, promoting a successful reorganization is one of the most important public interests."); *In re Lazarus Burman Assocs.,* 161 B.R. 891, 901 (Bankr. E.D. N.Y. 1993) ("The public interest, in the context of a bankruptcy proceeding, is in promoting a successful reorganization."); *see also In re Adelphia Comm'cns Corp.*, 368 B.R. 140, 284 (Bankr. S.D.N.Y. 2007) ("The public interest requires bankruptcy courts to consider the good of the case as a whole."); *Am. Film Techs v. Taritero (In re Am. Film Techs.),* 175 B.R. 847, 849 (Bankr. D. Del. 1994) ("It is 'one of the paramount interests' of this court to assist the Debtor in its

reorganization efforts.") (quoting *Gathering Rest., Inc. v. First Nat'l Bank of Valparaiso (In re Gathering Restr., Inc.)*, 79 B.R. 992, 1001 (Bankr. N.D. Ind. 1986)).

The provisional relief will align the chapter 15 cases with the Spanish Proceeding, thereby assisting the Foreign Debtors' to handle the reorganization in a fair and efficient manner, enabling the Foreign Debtors to achieve viability through the global restructuring and recapitalization process, and protecting and maximizing the value of the Foreign Debtors' assets in the United States and protecting the interests of the Foreign Debtors' creditors in the Spanish Proceeding.

## VI.
## IN THE ALTERNATIVE, THE COURT SHOULD GRANT THE SPANISH COURT COMITY AND IMPOSE PROVISIONAL RELIEF

The provisional relief sought also comports with the long-standing policy of extending comity to foreign jurisdictions and promoting cooperation between jurisdictions in cross-border insolvency proceedings.  Specifically, section 1501(a) of the Bankruptcy Code provides:

> (a) The purpose of this chapter is to incorporate the Model Law on Cross-Border Insolvency so as to provide effective mechanisms for dealing with cases of cross-border insolvency with the objectives of —
>
> > (3) fair and efficient administration of cross-border insolvencies that protects the interests of all creditors, and other interested entities, including the debtor;
> >
> > (4) protection and maximization of the value of the debtors' assets; and
> >
> > (5) facilitation of the rescue of financially troubled businesses, thereby protecting investment and preserving employment.

11 U.S.C. § 1501(a); *see, e.g., Cornfeld v. Inv. Overseas Servs., Ltd.*, 471 F. Supp. 1255, 1259 (S.D. N.Y. 1979) (stating that recognizing the Canadian liquidation proceeding would further "American public policy" because "the firm policy of American courts is the staying of actions against a corporation which is the subject of a bankruptcy proceeding in another jurisdiction");

11 U.S.C. § 1508 ("In interpreting [Chapter 15], the court shall consider its international origin, and the need to promote an application of this chapter that is consistent with the application of similar statutes adopted by foreign jurisdictions.").

When the United States adopted chapter 15, it included references to "comity" because as U.S. insolvency law evolved in the later part of the twentieth century, it became clear that "comity is the central consideration in determining whether to provide relief to a foreign insolvency representative." *See* Burton Lifland, *Chapter 15 of the United States Bankruptcy Code: An Annotated Section-By-Section Analysis*, in CROSS-BORDER INSOLVENCY AND CONFLICT OF JURISDICTIONS A US-EU EXPERIENCE (Georges Affaki, ed. 2007), at 31, 45; *see also* Samuel L. Bufford, UNITED STATES INTERNATIONAL INSOLVENCY LAW 2008-2009 (2009), at 33 ("Chapter 15 appears to restrict the role [of] comity, and provides for it only in the context of a court's decision to provide additional assistance to a foreign representative under § 1507. However, comity continues to play a large role in the context of transnational insolvency cases and chapter 15 . . . [and] its influence in chapter 15 is pervasive.").  Thus, chapter 15 modified Articles 7 and 9 of the Model Law to include references to comity.  Section 1507 of the Bankruptcy Code provides that "[i]n determining whether to provide additional assistance under this title or under other laws of the United States, the court shall consider whether such additional assistance, consistent with the principles of comity," will reasonably assure compliance with a list of factors.  Chapter 15 of the Bankruptcy Code has expressly imported into its provisions the concept of comity, and, thus, at least for the provisional period, it would be appropriate for this Court, in reliance on its general equitable powers in section 105 of the Bankruptcy Code, to impose the provisional relief here requested under general principles of comity.

Case 16-10754-KJC    Doc 7    Filed 03/29/16    Page 36 of 39


While the Bankruptcy Code does not define "comity," courts have explained the concept as a "recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens, or of other persons who are under the protections of its laws." *Hilton v. Guyot*, 159 U.S. 113, 164 (1895). The principle of comity is used flexibly to guide a court's decision making process as comity "is not a rule of law, but one of practice, convenience, and expediency." *Overseas Inns S.A. P.A. v. United States*, 911 F.2d 1146, 1148 (5th Cir. 1990) (quotation marks and citation omitted). "[C]omity compels national courts to act at all times to increase the international legal ties that advance the rule of law within and among nations . . . . [C]omity serves our international system like the mortar which cements together a brick house. No one would willingly permit the mortar to crumble or be chipped away for fear of compromising the entire structure." *Laker Airways Ltd. v. Sabena, Belg. World Airlines*, 731 F.2d 909, 937 (D.C. Cir. 1984). The Second Circuit Court of Appeals described comity as being "concerned with maintaining amicable working relationships between nations, a shorthand for good neighborliness, common courtesy and mutual respect between those who labor in adjoining judicial vineyards." *JP Morgan Chase Bank v. Altos Hornos de Mexico, S.A. de C.V.*, 412 F.3d 418, 423 (2d Cir. 2005).

In short, "comity" is the notion that a court should defer to foreign laws or judgments of foreign courts out of respect for a foreign nation when the deferring court would normally take a different action with respect to the dispute at issues (of course if the deferring court would reach the same conclusion, comity is not necessary). *See* 6A NORTON BANKR. L. & PRAC. 2d § 152:16 (1997-98) ("Because private international law is focused on the relationship between the person that has cross-border contacts, it is necessarily a set of principles designed to determine which

nation's laws should apply to any given dispute.  These principles govern the determination of whether comity should be extended to the non-US proceedings, judgments or laws.").  The problem with "comity" from a statutory standpoint is that the "boundaries of the duties it imposes are inherently uncertain" since the doctrine "turns on the consideration of a number of facts that vary according to the specific facts and circumstances of each case.  Thus, the appropriate weighting of foreign court decisions must be decided on a case by case basis." Bufford, *supra*, at 34-5 (citing *Laker Airways Ltd.*, 731 F.2d at 937); *see also Note: The Extension of Comity to Foreign Bankruptcy Proceedings:* Philadelphia Gear Corp. v. Philadelphia Gear de Mexico, S.A., 20 N.C. J. INT'L L. & COMM. REG. 629, 636 (1995) ("Because comity is an exercise of a court's discretion in light of the facts of the specific case, U.S. courts are free to balance potentially conflicting policy considerations and to deny comity to foreign bankruptcy proceedings").

Here and as explained in the Fernádez Declaration, the Spanish Courts have been presiding over a process that the Foreign Debtors initiated to reorganize.  The Spanish Court has entered a decree opening pre-insolvency proceedings and imposing a moratorium on creditor actions against the Foreign Debtors as contemplated by the Standstill Agreement, the latter of which enforces the stay contractually agreed to by at least 60% of the financial creditors to all of the creditors similarly situated.  The Foreign Representative respectfully submits to this Court that, in the alternative to granting provisional relief under section 1519 of the Bankruptcy Code, it should impose a provisional stay under the common law principles of comity to enable the Foreign Debtors adequate breathing space within the territorial jurisdiction of the United States so that they may continue to dedicate their resources and efforts to accomplishing a global restructuring agreement.  In balancing the issues, the Foreign Representative admits that the

limited relief sought, namely a stay for a short time until a final hearing, fits will within the legal doctrine of comity that has prevailed in the United States for at least 120 years.  For these alternative reasons then, the Court should grant the provisional relief requested in the Emergency Motion.

## VII.
## CONCLUSION

For all of the reasons stated herein and in the Emergency Motion, the Court should enter the Order attached as Exhibit A to the Emergency Motion and grant the Foreign Representative all of the provisional relief requested therein and such other and further relief as the Court finds necessary and appropriate under the circumstances present.

Dated:  Wilmington, Delaware
         March 28, 2016

Respectfully submitted,

**DLA PIPER LLP (US)**

By:   /s/ R. Craig Martin
R. Craig Martin, Esq. (Bar No. 5032)
1201 North Market Street, 21st Floor
Wilmington, DE 19801
Telephone: 302.468.5700
Facsimile:  302. 778.7834
E-mail: Craig.Martin@dlapiper.com

- and -

Richard A. Chesley, Esq.
Oksana Koltko Rosaluk, Esq.
203 North LaSalle Street, Suite 1900
Chicago, IL 60601-1293
Telephone: 312.368.4000
Facsimile: 312.236.7516
E-mail: Richard.Chesley@dlapiper.com
          Oksana.KoltkoRosaluk@dlapiper.com

*Attorneys for Foreign Representative of Foreign
Debtors, Abengoa, S.A. and its related subsidiary
petitioners*